IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Prebel Alley, *on her own behalf and on behalf of all others similarly situated*, <br><br> Plaintiff, <br><br> v. <br><br> Chicago Transit Authority, <br><br> Defendant. | Case No. 23-cv-00409 |

## Complaint

For her complaint against Defendant Chicago Transit Authority (the "CTA"), Prebel Alley ("Alley"), on her own behalf and on behalf of all others similarly situated, states as follows:

### Parties

1. Plaintiff Alley was formerly a bus operator for the CTA.

2. Defendant CTA is an independent governmental agency which operates the nation's second largest public transportation system—in Chicago and 35 surrounding suburbs.

### Jurisdiction and Venue

3. This action arises under the laws of the United States, specifically, the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* and the First and Fourteenth Amendments to the United States Constitution.

4. This action also arises under the laws of the State of Illinois, specifically the Illinois Religious Freedom Restoration Act, 775 ILCS 35, *et seq.*, the Illinois Health Care Right of Conscience Act, 745 ILCS 70, *et seq*; and the Illinois Human Rights Act, 775 ILCS 5/2-102.

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)(2) because the CTA is headquartered in the Northern District of Illinois and a substantial part of the events or omissions giving rise to Alley's claims occurred in this District.

7. This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§2201-02, implemented through Rule 57 of the Federal Rules of Civil Procedure.

**Facts**

8. On or around November 13, 2019, Alley was hired as a bus operator for the CTA.

9. Alley began working as a bus operator for the CTA on or around December 2, 2019.

10. At all relevant times during her employment with the CTA, Alley was a dedicated employee who met or exceeded the CTA's legitimate employment expectations.

11. Beginning in late 2019 and early 2020, a global outbreak of a virus now referred to as COVID-19 emerged.

12. COVID-19 was officially declared a pandemic by the World Health Organization in March 2020.

13. At that time, great efforts were made by the public and private sector alike to develop a vaccine.

14. To combat the spread of the virus, public health experts opined that the public should practice social distancing, wear masks, and isolate if showing symptoms of COVID-19. Employers across the country began requiring employees to practice these measures, and many also began permitting remote work.

15. The U.S. Food and Drug Administration eventually granted Emergency Use Authorization for a COVID-19 vaccine, the Pfizer-BioNTech vaccine, on December 11, 2020. The

Moderna vaccine was granted Emergency Use Authorization on December 18, 2020. The Johnson & Johnson vaccine was granted Emergency Use Authorization on February 27, 2021.

16. With vaccines available to the general public, employers began to mandate that employees get vaccinated, or else suffer adverse employment action, such as being placed on unpaid leave or being terminated.

17. The CTA did not initially require that employees obtain a COVID-19 vaccine. Throughout most of the pandemic, the CTA allowed its employees to continue working by encouraging safety measures, such as masking and social distancing.

18. Alley, like many other CTA employees, continued to work throughout the pandemic, was viewed as essential worker, and was eventually proclaimed as one of the "unsung heroes of the pandemic" by CTA President Dorval R. Carter Jr. ("Carter Jr.").

19. The lack of a vaccine mandate throughout most of the pandemic did not cause the CTA any undue hardship.

20. On September 3, 2021, approximately 10 months after the first vaccine was authorized, the CTA announced that all CTA employees were required to be fully vaccinated against COVID-19.

21. At that time, Carter Jr. proclaimed that employees had to be vaccinated in order to "help fight off these variants and protect our loved ones and others who cannot be vaccinated."

22. Carter Jr. made that proclamation even though the COVID-19 vaccines were not tested, designed, or made to prevent transmission of COVID-19.

23. The mandatory COVID-19 Vaccination Policy also did not take into account individuals who have already recovered from COVID-19 and thus had antibodies or natural immunity, nor did it take into account alternative measures such as face coverings, personal protective equipment, self-monitoring and reporting of symptoms, or periodic testing.

24. The CTA's mandatory COVID-19 Vaccination Policy was at odds with the Federal government's policy allowing certain large employers to mandate vaccination *or* periodic testing for their employees.

25. The CTA's mandatory COVID-19 Vaccination Policy also differed substantially from the European Union's digital COVID-19 certificate, which considered the following as equivalent: (1) a COVID-19 vaccine; (2) a negative COVID-19 test; or (3) having previously recovered from COVID-19.

26. The CTA has claimed, and still claims, to offer religious exemptions/ accommodations, stating on their "Careers" website the following:

> The CTA complies with all federal and state laws forbidding discrimination and will attempt to provide a reasonable accommodation to otherwise qualified individuals to enable them to perform the essential functions of the job. CTA will make reasonable accommodations for the known disabilities of otherwise qualified applicants for employment as well as its employees, unless undue hardship would result. . . . CTA will work with you to determine if an accommodation can be provided…
>
> If you are an applicant requesting a COVID-19 vaccine religious accommodation or other, please email the Equal Employment Opportunity Unit at EEODiversity@transitchicago.com."

27. In order to obtain a religious exemption/accommodation from the mandatory COVID-19 Vaccination Policy, employees have to complete a "Request For Religious Exemption/Accommodation Related to COVID-19 Vaccine."

28. On September 29, 2021, Alley completed and submitted her request for a religious exemption/accommodation.

29. In her request for a religious exemption/accommodation, Alley cited six verses from the Bible and informed the CTA that she was a member of the "Glorious Miracle Temple World Outreach Ministries," that she had an "unwavering belief in the Word of God," that her religion's teachings are "clear that any relation to abortion is an affront to God," that the vaccines "used

4

aborted fetal cell lines" (and, thus, could not enter her body), and that she could not "willingly and knowingly offend God."

30. In her request for a religious exemption/accommodation, Alley attached a written statement from the Glorious Miracle Temple World Outreach Ministries' founder and president, Apostle John H. Miles Sr., and its Senior Pastor, Brenda Miles.

31. The written statement from John H. Miles Sr. and Brenda Miles cited two Bible verses and explained that the "use of any product containing or derived from the remains of unborn babies terminated by abortion is absolutely forbidden," as well as that "knowingly accepting such a product into one's body is to become an accessory to murder, subject to the full force of Biblical law."

32. Alley's sincerely held religious beliefs, rooted in scripture and religious teachings, precluded (and preclude) her from accepting into her body the Johnson & Johnson, Pfizer, and Moderna vaccines because all three vaccines were derived from, produced, manufactured by, tested on, developed with, have their origins in research on, or are otherwise connected to aborted fetal cell lines.

33. On December 25, 2021, Alley tested positive for the COVID-19 virus. She fully recovered and returned to work soon thereafter.

34. On March 31, 2022, the CTA asked Alley what form of accommodation she was requesting.

35. On April 7, 2022, Alley informed the CTA that she was requesting that she "be allowed to undergo weekly COVID-19 testing in lieu of taking the vaccine."

36. On May 3, 2022, the CTA denied Alley's request for an exemption/accommodation, claiming that the accommodation she had requested somehow compromised workplace safety.

Despite this claim, the CTA granted exemptions/allowed accommodations for other employees, due to their religious beliefs.

37. Alley continued to hold true to her beliefs and continued to refuse, and to this day has refused, to obtain a COVID-19 vaccine.

38. Despite the CTA's insistence that every employee had to be vaccinated in order to work for the CTA, and that Alley allegedly compromised workplace safety, the CTA allowed Alley to continue working until June 14, 2022.

39. On June 7, 2022, Alley was given a final warning—that she would be terminated if she did not agree to get vaccinated; in response, Alley informed the CTA that she could not agree to get vaccinated.

40. On June 14, 2022, the CTA removed Alley from service, after she confirmed that she had not received the vaccine.

41. On June 21, 2022, the CTA terminated Alley for failing to get the vaccine.

42. Upon information and belief, the CTA has never required the public to get vaccinated in order to utilize its public transportation services.

43. Upon information and belief, the CTA has never required its employees to obtain vaccine boosters.

44. As a result of the CTA's actions, Alley and hundreds of other similarly situated employees have sustained damages including, but not limited to, lost income, lost bonuses, lost insurance, lost company benefits, and emotional distress.

**Class Allegations**

45. Through this action, Alley seeks to represent a class of all CTA employees who have requested or will request religious exemptions and accommodations from the mandatory COVID-19 Vaccination Policy and who have had those requests unlawfully denied.

6

46. Alley brings this class action under Federal Rules of Civil Procedure 23(a) and (b).

47. The class is so numerous that joinder of all members is impractical. Based on FOIA information obtained by counsel, the exact class size appears to be 537.

48. There are questions of law and fact common to all members of the class. Those common questions include, but are not limited to, the following:

   a. Did the CTA comply with federal and state law when it denied religious exemption and accommodation requests to the vast majority (94%) of those who applied?

   b. Does the CTA have an undue hardship to deny the vast majority of religious exemption requests?

   c. Did the CTA violate federal and state law when it granted some religious exemption requests, and provided for some reasonable accommodations, even while denying Alley's similar requests?

   d. Did the CTA comply with its obligations under federal law to engage in the interactive process when responding to each exemption request?

   e. Did the CTA provide an adequate mechanism for requesting and obtaining a religious exemption when it provided employees only seven days to provide additional information beyond the initial exemption request, and failed to consider any evidence if not received within that small timeframe?

49. Alley's claims are typical of the claims of the class because she, like the class members, requested exemption and accommodation from the mandatory COVID-19 Vaccination Policy, and the CTA denied those requests.

50. For the same reason, Alley will fairly and adequately protect the interests of the class.

7

51. The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating Alley's claims. Joinder of all members is impracticable.

### COUNT I – VIOLATION OF TITLE VII, 42 U.S.C. § 2000e, *et seq.*

52. Alley hereby realleges and adopts each and every allegation in paragraphs 1-51 as if fully set forth herein.

53. Title VII of the Civil Rights Act of 1964 prohibits the CTA from discriminating against its employees on the basis of their sincerely held religious beliefs. *See* 42 U.S.C. §2000e-2(a)

54. Alley holds sincere religious beliefs that preclude her from receiving a COVID-19 vaccine.

55. Alley informed the CTA of those beliefs and requested a religious exemption from/accommodation related to the vaccine mandate.

56. The CTA failed to provide Alley with a religious exemption/accommodation, thereby discriminating against Alley because of her religious beliefs.

57. The CTA did not, and does not, have any undue hardship to justify the denial of Alley's religious exemption/accommodation request.

58. The CTA's failure to provide Alley a religious exemption/accommodation has harmed and will continue to harm Alley.

59. Alley has filed a charge with the EEOC complaining of these discriminatory actions, has received a "Right to Sue" letter, and is filing this complaint within 90 days thereof.

WHEREFORE, Alley respectfully prays for relief against the CTA as set forth in the Prayer for Relief set out below.

### COUNT II – VIOLATION OF THE FIRST AMENDMENT
### FREE EXERCISE CLAUSE

60. Alley hereby realleges and adopts each and every allegation in paragraphs 1-51 as if fully set forth herein.

61. The Free Exercise Clause of the First Amendment to the United States Constitution (made applicable to the states by the Fourteenth Amendment) provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof…" U.S. CONST. amend. I.

62. The CTA's mandatory vaccine policy substantially burdened Alley's free exercise of religion by unlawfully conditioning her employment on Alley abandoning her religious beliefs.

63. The CTA's mandatory vaccine policy was not neutral and generally applicable as the CTA granted at least 36 religious exemption/accommodation requests, but denied a similar request made by Alley.

64. The CTA engaged in a process of individualized assessments when it reviewed requests for religious exemptions/accommodations.

65. The CTA's termination of Alley cannot be justified by a compelling governmental interest and is not narrowly tailored to advance any such interest.

WHEREFORE, Alley respectfully prays for relief against the CTA as set forth in the Prayer for Relief set out below.

### COUNT III – VIOLATION OF FOURTEENTH AMENDMENT
### EQUAL PROTECTION

66. Alley hereby realleges and adopts each and every allegation in paragraphs 1-51 as if fully set forth herein.

67. The Equal Protection Clause of the Fourteenth Amendment requires that the government treat similarly situated persons alike.

9

68. The CTA has violated Alley's right to equal protection by granting religious exemption/accommodation requests to some similarly situated employees but denying the same to her.

69. The CTA has violated Alley's right to equal protection by continuing to employ certain bus operators that are not vaccinated, but refusing to continue to employ Alley on an equal basis.

70. Under the Equal Protection Clause, government actions and laws which burden a fundamental right and treat persons unequally based on an inherently suspect classification are subject to strict scrutiny.

71. The CTA cannot satisfy strict scrutiny.

WHEREFORE, Alley respectfully prays for relief against the CTA as set forth in the Prayer for Relief set out below.

### COUNT IV – VIOLATION OF THE ILLINOIS HEALTH CARE RIGHT OF CONSCIENCE ACT, 745 ILCS 70

72. Alley hereby realleges and adopts each and every allegation in paragraphs 1-51 as if fully set forth herein.

73. The Illinois Health Care Right of Conscience Act (the "Act") protects Alley's rights to engage in the exercise of her sincerely held religious beliefs without fear of discrimination from any entity, whether public or private, including the CTA.

74. In fact, the State of Illinois has declared it to be the public policy of the State to protect the religious conscience rights of all individuals in the State of Illinois as it relates to health care services. The Illinois Health Care Right of Conscience Act provides, specifically,

> The General Assembly finds and declares that people and organizations hold different beliefs about whether certain health care services are morally acceptable. **It is the public policy of the State of Illinois to respect and protect the right of conscience of all persons who refuse to obtain, receive or accept, or who are engaged in, the delivery of, arrangement for, or payment of health care**

10

> **services and medical care whether acting individually, corporately, or in association with other persons; and to prohibit all forms of discrimination, disqualification, coercion, disability or imposition of liability upon such persons or entities by reason of their refusing to act contrary to their conscience or conscientious convictions in providing, paying for, or refusing to obtain, receive, accept, deliver, pay for, or arrange for the payment of health care services and medical care**. It is also the public policy of the State of Illinois to ensure that patients receive timely access to information and medically appropriate care.

745 ILCS 70/2 (emphasis added).

75. In furtherance of the State of Illinois public policy of protecting the religious conscience rights of all Illinoisans to exercise their sincere religious convictions in their medical decision-making, the Illinois Health Care Right of Conscience Act states:

> **It shall be unlawful for any** person, public or **private institution**, or public official **to discriminate against any person in any manner**, including but not limited to, licensing, hiring, promotion, transfer, staff appointment, hospital, managed care entity, or **any other privileges**, **because of such person's conscientious refusal to receive, obtain, accept, perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care services contrary to his or her conscience**.

745 ILCS 70/5 (emphasis added).

76. The Illinois Health Care Right of Conscience Act further provides:

> **It shall be unlawful for any public or private** employer, entity, agency, **institution**, official or person, including but not limited to, a medical, nursing or other medical training institution, to deny admission because of, to place any reference in its application form concerning, to orally question about, to impose any burdens in terms or conditions of employment on, or to otherwise discriminate against, any applicant, in terms of employment, **admission to or participation in any programs for which the applicant is eligible, or to discriminate in relation thereto, in any other manner, on account of the applicant's refusal to receive, obtain, accept, perform, counsel, suggest, recommend, refer, assist or participate in any way in any forms of health care services contrary to his or her conscience.**

745 ILCS 70/7 (emphasis added).

77. The Illinois Health Care Right of Conscience Act defines "Health care" broadly to include vaccinations. Specifically, it provides that "Health Care":

11

means **any phase** of patient care, including but not limited to, **testing**; diagnosis; **prognosis**; ancillary research; **instructions**; family planning, counselling, referrals, or any other advice in connection with the use or procurement of contraceptives and sterilization or abortion procedures; **medication**; surgery or **other care or treatment rendered by a physician or physicians, nurses, paraprofessionals or health care facility**, **intended** for the **physical**, emotional, and mental well-being of persons.

745 ILCS 70/3 (a) (emphasis added).

78. The Illinois Health Care Right of Conscience Act defines "Conscience," as "a sincerely held set of moral convictions arising from belief in or relation to God, or which, though not so derived, arises from a place in the life of its possessor parallel to that filled by God among adherents to religious faiths." 745 ILCS 70/3(e).

79. A violation of the Illinois Health Care Right of Conscience Act provides for the following remedies:

> **Any person, association, corporation, entity or health care facility injured by any public or private person, association, agency, entity or corporation by reason of any action prohibited by this Act may commence a suit therefor, and shall recover threefold the actual damages, including pain and suffering, sustained by such person, association, corporation, entity or health care facility, the costs of the suit and reasonable attorney's fees; but in no case shall recovery be less than $2,500 for each violation in addition to costs of the suit and reasonable attorney's fees. These damage remedies shall be cumulative, and not exclusive of other remedies afforded under any other state or federal law**.

745 ILCS 70/12 (emphasis added).

80. The Illinois Health Care Right of Conscience Act acts as a super statute in Illinois, preempting and superseding all other acts and portions of acts that conflict with the explicit policies contained in the statute.

81. Specifically, the Illinois Health Care Right of Conscience Act states: "This Act shall supersede all other Acts or parts of Acts to the extent that any Acts or parts of Acts are inconsistent with the terms or operation of this Act." 745 ILCS 70/14.

82. Even as a public institution, the CTA is subject to the provision of the Illinois Health Care Right of Conscience Act under 745 ILCS 70/5 and 745 ILCS 70/7, and is therefore prohibited from discriminating against Alley for her refusal to accept one of the vaccines on account of her sincerely held religious beliefs.

83. Alley's sincerely held religious beliefs, which were articulated to the CTA under the signed written requests required by the mandatory COVID-19 Vaccination Policy, constitutes Alley's "conscience" under the Act because they are "a sincerely held set of moral convictions arising from belief in or relation to God." 745 ILCS 70/3(e).

84. The COVID-19 vaccines constitute "Health care" under the Act because they are a "phase of patient care," "medication," and "other care or treatment rendered by a physician or physicians, nurses, paraprofessionals or health care facility, intended for the physical, emotional, and mental well-being of persons." 745 ILCS 70/3(a).

85. The Act does not provide any defense to discriminate against Alley based on so-called "undue hardship." *Rojas v. Martell*, 2020 IL App (2d) 190215, ¶ 43.

86. By imposing its mandatory COVID-19 Vaccination Policy upon Alley and refusing to grant her a religious exemption from/accommodation related to the mandatory COVID-19 Vaccination Policy, the CTA has impermissibly, unlawfully, and unconscionably discriminated against Alley because of her conscientious refusal to receive or accept one of the three currently available COVID-19 vaccines in contradiction to her rights of conscience and sincerely held religious beliefs.

87. By taking adverse employment action against Alley for failure to comply with the mandatory COVID-19 Vaccination Policy, the CTA has impermissibly discriminated against Alley on account of her sincerely held religious objections to receiving or accepting one of the three COVID-19 vaccines in violation of 745 ILCS 70/5.

88. The mandatory COVID-19 Vaccination Policy, on its face and as applied, is a gross violation of Alley's sincerely held beliefs, and her right of conscience under the Illinois Health Care Right of Conscience Act.

89. The mandatory COVID-19 Vaccination Policy, on its face and as applied, is an impermissible discrimination against Alley on the basis of her sincerely held religious beliefs, and in violation of Alley's rights of conscience under the Illinois Health Care Right of Conscience Act.

WHEREFORE, Alley respectfully prays for relief against the CTA as set forth in her Prayer for Relief set out below.

### COUNT V – VIOLATION OF THE ILLINOIS RELIGIOUS FREEDOM RESTORATION ACT

90. Alley hereby realleges and adopts each and every allegation in paragraphs 1-51 as if fully set forth herein.

91. The Illinois Religious Freedom Restoration Act provides:

> "Government may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless it demonstrates that application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest."

(775 ILCS 35).

92. The CTA's mandatory vaccine policy substantially burdened Alley's exercise of religion by conditioning her employment on Alley abandoning her religious beliefs.

93. The CTA cannot meet its burden of demonstrating that its termination of Alley, and others similarly situated, was in furtherance of a compelling governmental interest and that it was the least restrictive means of furthering that interest.

WHEREFORE, Alley respectfully prays for relief against the CTA as set forth in her Prayer for Relief set out below.

## COUNT VI: VIOLATION OF THE ILLINOIS HUMAN RIGHTS ACT

94. Alley hereby realleges and adopts each and every allegation in paragraphs 1-51 as if fully set forth herein.

95. The Illinois Human Rights Act provides:

It is a civil rights violation: …[f]or any employer to impose upon a person as a condition of …retaining employment…any terms or conditions that would require such person to violate or forgo a sincerely held practice of his or her …religion…unless, after engaging in a bona fide effort, the employer demonstrates that it is unable to reasonably accommodate the employee's….sincerely held religious belief, practice or observance without undue hardship on the conduct of the employer's business."

775 ILCS 5/2-102(E-5).

96. The CTA's mandatory Vaccination Policy imposed upon Alley a condition of employment that required her to violate or forgo her sincerely held religious beliefs.

97. Alley informed the CTA of those beliefs and requested an exemption/accommodation from the vaccine mandate.

98. The CTA denied her exemption/accommodation request without engaging in a *bona fide* effort to determine whether an accommodation was possible.

99. Granting her an exemption/accommodation would not have caused the CTA undue hardship.

100. The CTA's actions have harmed and will continue to harm Alley.

101. Alley filed a charge with the Illinois Department of Human Rights complaining of these discriminatory actions, received a "Right to Sue" letter, and is filing this complaint within 95 days thereof.

WHEREFORE, Alley respectfully prays for relief against the CTA as set forth in the Prayer for Relief set out below.

**Jury Demand**

Alley demands a jury trial pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

**Prayer for Relief**

WHEREFORE, Alley respectfully prays for relief as follows:

1. That the Court certify this action as a class action under Federal Rules of Civil Procedure 23(a) and (b);

2. That this Court render a Declaratory Judgment declaring that the CTA's mandatory COVID-19 Vaccination Policy, both on its face and as applied by the CTA, is illegal and unlawful under Title VII, 42 U.S.C. § 2000e, *et seq.*; the Free Exercise Clause of the First Amendment to the United States Constitution; the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; the Illinois Religious Freedom Restoration Act; the Illinois Health Care Right of Conscience Act, 745 ILCS 70/5 and 745 ILCS 70/7; and the Illinois Human Rights Act and further declaring that: by terminating Alley (and others similarly situated) from employment with the CTA, the CTA has unlawfully discriminated against Alley, and others similarly situated, on account of sincerely held religious objections to receiving or accepting one of the three COVID-19 vaccines;

3. That this Court adjudge, decree, and declare the rights and other legal obligations and relations within the subject matter here in controversy so that such declaration shall have the full force and effect of final judgment.

4. That this Court retain jurisdiction over the matter for the purposes of enforcing the Court's order; and

5. That the CTA be found liable, that judgment be entered against it, and that Alley, as well as all those similarly situated, be awarded all remedies to which she and they are entitled under the law, including:

a. back pay, including lost benefits;
b. front pay, including benefits (or reinstatement);
c. compensatory damages, including for emotional distress;
d. actual damages in an amount to be proven at trial (but not less than $2,500 per violation, as provided by 745 ILCS 70/12);
e. treble her actual damages, including those for emotional distress and pain and suffering, as provided by 745 ILCS 70/12;
f. reasonable costs and expenses of this action, including reasonable attorneys' fees and expert fees; and
g. such other and further relief as the Court deems equitable and just under the circumstances.

Respectfully Submitted by,


/s/ Julie Herrera
/s/ Steve Molitor

Law Office of Julie O. Herrera
159 N. Sangamon St., Ste. 200
Chicago, IL 60607
312-479-3014 (Phone)
708-843-5802 (Fax)
jherrera@julieherreralaw.com
smolitor@julieherreralaw.com


/s/ Sorin A. Leahu

Leahu Law Group, LLC
53 W. Jackson Blvd, Suite 1527
Chicago, IL 60604
Telephone: (847)-529-7221
sleahu@leahulaw.com